**Joshua H. BERGER, Moriah H. Berger, by Next Friend Allen H. BERGER, Plaintiffs,**

v.

**RENSSELAER CENTRAL SCHOOL CORPORATION, Defendant.**

**Civ. No. L 90–19.**

United States District Court, N.D. Indiana, Hammond Division at Lafayette.

May 7, 1991.

---

**698**

Franklin A. Morse, II, Barnes & Thornburg, South Bend, Ind., and Richard A. Waples, Indiana Civ. Liberties Union, Indianapolis, Ind., for plaintiffs.

John R. Price, Indianapolis, Ind., for defendant.

*Order on Cross Motions for Summary Judgment*

ALLEN SHARP, Chief Judge.

In this action the plaintiffs charge the defendant school corporation with the unconstitutional distribution and dissemination of religious material in violation of the first and fourteenth amendments to the Constitution of the United States. The plaintiffs are elementary school students enrolled in the Rensselaer Central School Corporation, a municipal corporation organized and existing under the laws of the State of Indiana. Pursuant to Fed.R.Civ.P. 17(c), the plaintiffs, by their next friend

(their natural father, Allen H. Berger), seek a declaratory judgment and preliminary and permanent injunctive relief. Jurisdiction is premised upon 28 U.S.C. §§ 1331 and 1343, and venue is proper pursuant to 28 U.S.C. §§ 94(a)(3) and 1391.

**I.**

Both parties have moved for summary judgment under Fed.R.Civ.P. 56. The standards a court employs in reviewing a motion for summary judgment are well-established. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if there is "sufficient evidence favoring the nonmoving party for a [reasonable] jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *See also La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.,* 914 F.2d 900, 905 (7th Cir.1990). The movant bears the burden of establishing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Becker v. Tenenbaum–Hill Associates, Inc.,* 914 F.2d 107, 110 (7th Cir.1990). The movant may meet its burden by showing that "there is an absence of evidence to support the nonmoving party's case." *Id.,* quoting *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. Any doubt regarding the existence of a genuine issue of material fact must be resolved in favor of the nonmovant. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14.

If the moving party meets its burden, the nonmovant then must present specific facts showing that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The nonmovant cannot rest on mere allegations without significant

probative evidence in support of his claim. Accordingly, the nonmovant is required to go beyond the pleadings, affidavits, depositions, answers to interrogatories and admissions on file to designate specific facts showing a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553. For the following reasons, the court hereby GRANTS defendant's motion for summary judgment.

## II.

When the amended complaint was filed in May 1990, the plaintiff Joshua H. Berger ("Joshua") was ten years of age and enrolled as a student in the fifth grade at the Rensselaer Central Middle School, a school owned and operated by the defendant school corporation (Complaint at ¶ 4). The other plaintiff, Moriah H. Berger ("Moriah"), was seven years old and a first grader in the Monnett Elementary School, also within the defendant school district (*Id.*). Their complaint challenges a duly adopted policy of the school corporation concerning the distribution, display and exhibition of materials on school premises. In pertinent part, that policy provides:

5501.1 In the best interest of the student body, no person, group, or other organization shall distribute, display, or exhibit any book, tract, map, picture, sign, or other publication of any type on the Rensselaer Central School Corporation premises unless authorized by the superintendent and the building principal.

5501.2 Approval for the distribution, display or exhibit of any materials by any persons, group, or organizations not sponsored by the school must be cleared 72 hours (three (3) school days) in advance of any distribution, display, or exhibit through the superintendent and the building principal[']s offices. If permitted, the time and location of

distribution, display, or exhibit is to be determined by the administration.

\* \* \* \* \* \*

5501.5 Any person, group, or organization not a part of the Rensselaer Central School[ ] Corporation that does not abide by the above policy, at the request of school officials, shall be considered guilty of trespass and reported to local civil authorities.

5501.6 Questions concerning the distribution of materials on school premises that are not answered by the above policy shall be presented to the Board of School Trustees for clarification.

The plaintiffs allege that the school corporation, acting pursuant to this policy, routinely and unconstitutionally grants permission to religious organizations (especially, the Gideon Society) to distribute religious literature in its elementary and middle schools (Complaint at ¶ 7).[1] Among the religious materials allegedly disbursed were a book entitled "Young People of the Bible" and the Gideon Bible, which is an excerpted compilation from the King James Version of the Christian Holy Bible containing the New Testament and the Old Testament books of Psalms and Proverbs. The school corporation readily acknowledges that representatives of the Gideon organization have annually distributed their Bibles to Rensselaer's fifth grade classrooms "for so many decades that no one can remember when the practice commenced" (Defendant's Memorandum of Law on the Substantive First Amendment Questions at 2).

The undisputed evidence shows that the Gideons would make one visit per school year to the fifth grade students in the Rensselaer school system. Although the location of the distribution would vary, sometimes occurring in the classroom, at other times in the gymnasium or in the hallway, the Gideons' routine remained largely the same from year to year. Two Gideon representatives (both men) would

1. It is undisputed that organizations with religious affiliation are but one of the many local groups to have requested and been granted permission to avail themselves of the school corporation's literature-distribution policy. Other such organizations include Tri Kappa, Boy Scouts, Summer Athletics, and 4-H.

come to the school during regular school hours and speak to the students for no longer than a couple of minutes, indicating that Bibles would be made available to students wishing to take a copy. As part of their brief spiel, the representatives would explain who they were, what their organization stood for, and indicate that they had Bibles to distribute free of charge. They would tell a pun that the Bibles were red-colored because they were meant to be read. Then the students would form a queue and file by the two representatives who would hand each student a Bible. Throughout this demonstration, the classroom teacher remained present, although observing silently from another part of the room. At no time would the teacher say anything, or participate in the handing out of Bibles.

At one time, the Gideons would advise students to take the Bibles home to their parents, and if the parents objected, to return the Bibles to their teachers at school. Since then, there had been a school policy of first obtaining parental permission from each child who was to receive a Bible. In recent years, however, permission slips were not used, and there was apparently no other mechanism used to seek parental permission before students received the Bibles.

According to the complaint, Allen H. Berger first learned of the school's policy regarding the annual distribution of Gideon Bibles in October 1989 (Complaint at ¶ 9). On October 27, 1989, anticipating the impending Bible distribution scheduled for November 2, Berger wrote to the Superintendent of the School Corporation questioning the constitutionality of the school's practice and requesting that it cease. The superintendent replied on November 17, 1989, that the distribution of Bibles would temporarily be postponed pending the December 1989 meeting of the Board of School Trustees.

At the December meeting the school board voted to reaffirm the earlier practice, the superintendent announcing that " 'our policy concerning distribution, display or exhibition of [religious] materials on school premises remains unchanged,' and that requests for permission to do so would be granted in the same manner as in the past" (Complaint at ¶ 10). Again, in February 1990, during an in-service conference of teachers, the superintendent confirmed that "it was the policy of the School Corporation, upon receipt of a proper request, to permit the distribution of religious literature and other material by any organization, with the sole exception of 'Satanists' " (Complaint at ¶ 11).

Notwithstanding the defendant's steadfastness in retaining its prior policy, the Gideons never did distribute their Bibles to the classrooms in which Joshua and his contemporaries were fifth grade students at Rensselaer. The school corporation says that Allen H. Berger's frequent objections to the distribution policy resulted in that year's cancellation, with the result that no Gideon Bibles were made available to fifth graders (including Joshua) in the school system during the 1989–90 school year. Because Joshua and his classmates are now sixth graders (to whom the Gideons have never previously distributed their literature in Rensselaer) and because Moriah is only a second grader (at least three years away from receiving a Gideon Bible), the defendants claim that the Bergers lack standing to bring this action. In further support of its motion, the defendant offers the deposition of Gerald Kooy, president of the Jasper County (Indiana) Gideon Society, withdrawing his offer to supply Rensselaer school students with Bibles because of the Bergers' objections.

The plaintiffs acknowledge that the only religious material Joshua personally received was several years ago when he was in the first grade; although, they claim that other religious literature was recently distributed to some of Joshua's classmates (Plaintiffs' Response to Request for Admissions at 1–4). Joshua claims that as a first grader he received a book entitled "My Favorite Book," published by Good Will, Inc., and distributed in the schools just prior to the Christmas holiday (*Id.* at 1–2). The frontispiece of "My Favorite Book" bears the message "Best Wishes for the Holidays," and states that several local

businesses, including the "In Jesus' Love" Foundation, Inc., were responsible for the book's presentation. Its first page reads:

> For this new morning with its light, For rest and shelter of the night, For health and food, for love and friends, For everything that goodness sends, I am thankful.

Plaintiffs refer to this publication as evidence of the school corporation's predilection "to blur the constitutionally protected distinction between secular education and religious activity" (*Id.*).

The complaint contains no similar allegation that Joshua's sister (and co-plaintiff) Moriah ever received any religious material from the school. Her avowed non-receipt of religious literature, in conjunction with Joshua's acknowledgment that he has received no such literature since the first grade and Mr. Kooy's statement rescinding the Gideon Bible distribution, has prompted the school corporation's motion to dismiss this case, pursuant to Fed.R.Civ.P. 12(b)(1), for lack of subject matter jurisdiction. The school system argues that this matter fails to present the constitutionally required "case or controversy." Accordingly, before addressing the merits of plaintiffs' constitutional claim, the court must first consider the justiciability question.

### III.

The Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, by its terms limits the declaratory remedy to "actual controvers[ies]." The restriction is mandatory, for Article III extends the "judicial Power of the United States" only to actual, ongoing cases and controversies, and not disputes that are hypothetical, academic, or moot. In *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941), recounting Chief Justice Hughes's cryptic test of justiciability, the Supreme Court stated that the inquiry is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* at 273, 61 S.Ct. at 512, citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–42, 57 S.Ct. 461, 463–65, 81 L.Ed. 617 (1937).

The modern version of this test of justiciability is that a federal court cannot render an advisory opinion, a plaintiff must have standing, and a court cannot hear a case that is not yet ripe or that has become moot. *See* Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d §§ 3529–33 (1984) [hereinafter Wright & Miller]. Although the defendant challenges the justiciability of this action at each prong of the reformulated test, the court agrees with the plaintiffs that this case is justiciable, for it presents a concrete dispute in which the plaintiffs have standing, and the cause of action is ripe and not moot. The court considers each prong in turn.

### A.

 The facts of this case present a substantial controversy that is "definite and concrete," not hypothetical or abstract. Joshua and Moriah Berger remain students in the defendant school system, the stated policy of which permits the distribution of religious literature in its classrooms, despite plaintiffs' objection that the practice violates their constitutional rights under the first amendment. The court finds that the defendant's current policy, affecting these plaintiffs as currently enrolled students subject to that policy, presents an actual controversy capable of review in this court.

### B.

 The concept of standing focuses on the question whether the plaintiff is the proper litigant to bring suit. The emphasis is thus on the party and not the claim itself. The Supreme Court has articulated three standing requirements that a plaintiff must satisfy to bring his suit in federal court: (1) he must personally have suffered an actual or threatened injury caused by the defendant's allegedly illegal conduct, (2) the injury must be fairly traceable to the defendant's challenged conduct, and (3) the injury must be one that is likely to be

redressed through a favorable decision. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted); *see also Simmons v. I.C.C.,* 900 F.2d 1023, 1026 (7th Cir.1990).

With respect to the first requirement—that the plaintiff suffer an actual or threatened injury—the defendant has emphasized its intention to retain the policy permitting distribution of such materials, thereby subjecting both plaintiffs to the prospect of future constitutional injury.

Plaintiffs readily satisfy the second requirement also. Without question, plaintiffs' asserted injury is a direct "but for" cause of the school's corporation's policy. Were it not for the policy and the school's approval of the distribution of religious literature, there would be no constitutional injury.

Similarly, the complained-of injury is capable of total redress by a favorable decision in this court. Granting plaintiffs' request for relief would remedy their alleged injury by prohibiting and declaring illegal the defendant's further distribution of religious materials. Plaintiffs thus have standing to maintain this lawsuit.

### C.

■ The ripeness doctrine is another principle of justiciability. It can be viewed as a time dimension of standing, one of maturity to bring suit. It asks, in effect, whether there is yet any need for the court to act. A court may find that a case is not ripe for decision if the asserted injury is too remote or contingent to warrant the present adjudication. *See* Wright & Miller, § 3532.1 at 130.

The Supreme Court has often stated that the test of ripeness turns on the functional considerations of " 'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.' " *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Com'n,* 461 U.S. 190, 201, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983), quoting *Abbott Laboratories v. Gardner,*

387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). *See also Kerr–McGee Chemical Corp. v. City of West Chicago,* 914 F.2d 820, 823 (7th Cir.1990).

The court holds that this matter is ripe for adjudication under the two *Abbott* factors. First, the issues presented are fit for judicial decision because the question presented is almost purely legal. There is little factual dispute about what transpired, or given the school corporation's adherence to its distribution policy, what is likely to transpire. All the court need decide, therefore, is the legal consequence of undisputed factual events that are well document in this record. And even as to future events, the likelihood of "repeating history" is high given the tradition and regularity of the practice. Consequently, the passage of additional time will not substantially alter the factual record.

Second, because the asserted injury involves the denial of first amendment liberties, withholding review of this matter would work an undue hardship on plaintiffs. *See, e.g., Planned Parenthood Ass'n of Chicago Area v. Kempiners,* 700 F.2d 1115, 1122 (7th Cir.1983) (Cudahy, J.) ("Requirements of ripeness are less strictly construed in the first amendment context....") (citations omitted); *see also Spartacus Youth League v. Board of Trustees of Illinois Industrial University,* 502 F.Supp. 789, 796–97 (N.D.Ill.1980) ("In the First Amendment area, however, a somewhat relaxed standard ... is applicable.").

### D.

■ The mootness doctrine is grounded in the same principles of justiciability as standing and ripeness. Like ripeness, mootness is a temporal concept, involving not the maturity of the lawsuit, but its continuing vitality. A case is moot, and therefore nonjusticiable, when it is no longer "ongoing," or where the court is no longer capable of "affect[ing] the rights of litigants in the case before [it]." *See Lewis v. Continental Bank Corp.,* 494 U.S. 472, 110 S.Ct. 1249, 1253, 108 L.Ed.2d 400 (1990) citation omitted). Moreover, the require-

ment of Article III mandates that a federal court have jurisdiction throughout the litigation, not simply when suit was filed. "The parties must continue to have a 'personal stake in the outcome' of the lawsuit" (citations omitted). *Id.* 110 S.Ct. at 1254.

The school corporation argues that this lawsuit is moot for a couple of reasons. First, it claims that because neither plaintiff is currently in the fifth grade, none has a "personal stake" in the controversy. Second, the defendant maintains that Mr. Kooy's withdrawal of his offer to supply Gideon Bibles to the Rensselaer schools prevents any future constitutional injury from recurring. Both arguments are without merit because the court finds that two exceptions to the mootness doctrine apply to these facts.

■ The first exception to the mootness doctrine—the "capable of repetition yet evading review" exception—recognizes that some controversies are so short-lived that the total injury will occur before there is an opportunity for full judicial review. Even if the fallout from the constitutional injury is, as defendant claims, limited to students in the fifth grade, a nine-month school year will almost never be sufficiently long even to file pleadings and conduct discovery, let alone fully litigate the merits. In *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court held that the case remained justiciable even though the petitioner was no longer pregnant. The Court said that was because the normal nine-month pregnancy period made the case "capable of repetition, yet evading review." *Id.* at 124, 93 S.Ct. at 712 (citations omitted). The same reasoning applies in this case to salvage its justiciability.

■ But this case is justiciable for another reason also, viz., the application of the second mootness exception—the doctrine of voluntary cessation. The Supreme Court has held that "voluntary cessation of allegedly illegal conduct ... does not make the case moot" (citations omitted). *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). That is because the

defendant is free to return to his old ways[ ]. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion.... For to say that the case has become moot means that the defendant is entitled to a dismissal as a matter of right.... The courts have rightly refused to grant defendants such a powerful weapon against public law enforcement.

*Id.* (citations omitted). Thus, where a defendant has voluntarily discontinued the challenged conduct, the case will not be deemed moot unless the defendant demonstrates that "there is no reasonable expectation that the wrong will be repeated" (citation omitted). *Id.* at 633, 73 S.Ct. at 897. The school corporation has not made the required showing. It is not enough to plead that the Gideons have said they will not return with their Bibles to the Rensselaer schools. For the distribution of Bibles is not the only asserted constitutional injury. Objections also have been leveled against other kinds of religious material. Indeed, the actual source of the asserted injury lies not with the groups that wish to disseminate their literature but with the school corporation that ultimately grants their requests. Because the school system has indicated that its distribution policy remains unchanged and will continue, its voluntary cessation of the allegedly illegal activity cannot serve to render this case moot. Accordingly, having thus determined that this matter is justiciable, the court proceeds to address the merits of plaintiffs' constitutional claim.

### IV.

■ The plaintiffs allege that the school corporation's policy allowing the distribution of religious literature in its classrooms violates the establishment clause of the first amendment. The court briefly reviews the Supreme Court's jurisprudence in this area and applies the relevant precedent to these facts.

### A.

The opening words of the Bill of Rights are those of the establishment clause:

"Congress shall make no law respecting an establishment of religion...." Although the establishment clause by its terms applies only to federal government action, the Court has determined that the fourteenth amendment incorporates its provisions to encompass state action also. *Everson v. Board of Education*, 330 U.S. 1, 8, 14–15, 67 S.Ct. 504, 507, 510–11, 91 L.Ed. 711 (1947).

*Everson* is the Court's seminal establishment clause case. In addition to applying the clause to state (as well as federal) action, *Everson* outlined what would become the core establishment clause principle: strict government neutrality toward religion. "In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between Church and State.'" *Id.* at 16, 67 S.Ct. at 512 (citation omitted).

*Everson*'s doctrine of separation has evolved over the years into a three-pronged test for determining whether governmental action will survive an establishment clause challenge. As the Court stated in *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971): "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion ...; finally, the statute must not foster 'an excessive governmental entanglement with religion'" (citations omitted). With only limited revision, the so-called *Lemon* test today remains the constitutionally relevant analysis for establishment clause challenges.

The revision has occurred in the form of a *Lemon*-modified endorsement test. The first suggestion of an endorsement analysis appeared in Justice O'Connor's concurring opinion in *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), the Pawtucket, Rhode Island, creche case. The following year, in *Wallace v. Jaffree*, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985), the moment-of-silence case, the Court first referred to an endorsement inquiry in a majority opinion. Justice Stevens wrote the majority opinion and began his analysis with the venerable *Lemon*

test. "In applying the purpose test," wrote Stevens, "it is appropriate to ask 'whether government's actual purpose is to endorse or disapprove of religion.'" *Id.* at 56, 105 S.Ct. at 2489 (quoting *Lynch*, 465 U.S. at 690, 104 S.Ct. at 1368 (O'Connor, J., concurring)). He announced the Court's conclusion also in endorsement terms: "The legislature enacted [the statute] ... for the sole purpose of expressing the State's endorsement of prayer activities for one minute at the beginning of each schoolday.... Such an endorsement is not consistent with the established principle that the government must pursue a course of complete neutrality toward religion." *Wallace*, 472 U.S. at 60, 105 S.Ct. at 2491.

Concurring in *Wallace*, Justice O'Connor also addressed the purpose prong in endorsement terms, as had Justice Stevens, but she too framed the effect prong in the language of the endorsement test. As to the effect prong, O'Connor offered the same endorsement analysis she had recommended in *Lynch:* "The relevant issue is whether an objective observer, acquainted with the text, legislative history, and implementation of the statute, would perceive it as a state endorsement of prayer in the public schools." *Id.* at 76, 105 S.Ct. at 2500 (citations omitted).

Just a month after its decision in *Wallace*, the Court decided *Grand Rapids School District v. Ball*, 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985), where the Court invalidated government programs under which public teachers taught secular subjects at private religious schools. Justice Brennan wrote the Court's majority opinion, readily acknowledging the "manifestly secular" purpose of these programs, and focusing his analysis on the "effects" prong instead. Brennan found that the government programs could not withstand constitutional scrutiny because they "provide[d] a crucial symbolic link between government and religion." *Id.* at 385, 105 S.Ct. at 3223. He indicated that "an important concern of the effects test is whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denom-

inations as an endorsement, and by nonadherents as a disapproval, of their individual religious choices." *Id.* at 390, 105 S.Ct. at 3225. Brennan continued:

> The inquiry into this kind of effect must be conducted with particular care when many of the citizens perceiving the governmental message are children in their formative years. The symbolism of a union between church and state is most likely to influence children of tender years, whose experience is limited and whose beliefs consequently are the function of environment as much as of free and voluntary choice.

*Id.* (citations omitted).

In *County of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), the creche and menorah case, Justice Blackmun reaffirmed that since *Lynch* a majority of the Court has viewed the endorsement inquiry as the proper analytical device to evaluate establishment clause challenges. *Id.* 109 S.Ct. at 3103 (quoting *Lynch* and *Grand Rapids*). And just last Term in *Board of Educ. of Westside Community Schools v. Mergens*, — U.S. —, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990), a majority of the Court again embraced the endorsement method. *See id.* 110 S.Ct. at 2370–73, 2378–83. Only Justices Kennedy and Scalia expressly disavowed this approach, indicating that the "word endorsement has insufficient content to be dispositive." *Id.* 110 S.Ct. at 2377–78.

 The evolution of the traditional three-pronged *Lemon* test into a *Lemon*-modified endorsement test means that a court reviewing the constitutionality of a governmental practice under the establishment clause must now inquire: first, whether the government's actual purpose in performing or permitting the challenged action is to endorse or disapprove of religion; second, whether the governmental action is sufficiently likely to be perceived by an objective or reasonable observer as an endorsement or disapproval of religion; and third, whether the action fosters an excessive entanglement between government and religion. For the governmental action to withstand an establishment clause challenge, it must satisfy each of the three factors outlined above. Having thus reviewed the Supreme Court's modern establishment clause jurisprudence, the court applies the endorsement test to these facts.

### B.

The first inquiry focuses on whether there is a secular purpose to the school corporation's policy permitting the distribution of Gideon Bibles on school premises during school hours. The policy on its face is content neutral; it does not mention a supreme being, the holy scripture, or make any other religious reference. Nevertheless, the Bergers insist that the practice of making the Bibles available to Rensselaer school children indicates that the defendant's actual purpose was to endorse Christianity. The court disagrees. Heeding Justice O'Connor's deferential approach,[2] the court finds that the school's policy was motivated by at least one of many possible secular concerns. One could view the practice as simply a trespass regulation controlling the access of non-school persons or groups onto the school campus during school hours. Or it could be viewed as a program to make available to students locally generated literature reflecting many aspects of their community—civic, athletic, historic, as well as religious. In any event, the court finds that the defendant's policy satisfies the first *Lemon* prong because its purpose was not wholly religious and may have been wholly secular.

Next, *Lemon*'s effects prong asks whether the school's distribution policy would likely be perceived by a reasonable observer as endorsing Christianity. Put

---

2. "Even if the text and official history of a statute express no secular purpose, the statute should be held to have an improper purpose only if it is beyond purview that endorsement of a religious belief 'was and is the law's reason for existence.'" *Wallace v. Jaffree*, 472 U.S. at 75, 105 S.Ct. at 2499 (O'Connor, J., concurring in judgment) (citation omitted). Under this reasoning the distribution policy at issue here should be found to have a secular purpose in light of its text expressing no religious purpose.

differently, the inquiry can be framed as whether the policy would send a message to a non-Christian that he is an outsider. The court finds that no observer, Christian adherent or not, could reasonably view the Gideon organization's distribution of Bibles in the Rensselaer schools as an endorsement of the Christian faith. Permitting the local Gideons to circulate their literature in public school classrooms is no more an endorsement of Christianity than allowing little league baseball to disseminate its materials endorses the national pastime. Nor would a reasonable observer perceive a similar leaflet campaign by the American Civil Liberties Union or the Anti–Defamation League of B'nai B'rith as an endorsement of the respective views of these organizations.

This court is mindful of the Supreme Court's caveat that the judiciary be especially vigilant when reviewing religious messages aimed at young school children. Children of tender years are more likely to misapprehend the character and content of the message and infer a symbolic union between church and state when none is intended or existent. But the Court has also made clear that the context in which governmental conduct occurs can be dispositive of an establishment clause issue. *Compare Stone v. Graham*, 449 U.S. 39, 42, 101 S.Ct. 192, 194, 66 L.Ed.2d 199 (1980) (per curiam) (public school use of Ten Commandments for inspirational purposes held unconstitutional), *with Abington School District v. Schempp*, 374 U.S. 203, 225, 83 S.Ct. 1560, 1573, 10 L.Ed.2d 844 (1963) (religion and Bible studied in purely pedagogic manner held constitutional). Thus, where the Bible is used in a purely academic manner, there is no establishment clause violation, even when a publicly funded teacher leads such instruction during regular hours on school property.

In this case, where the Bibles emanated not from the teacher but from a private actor, who did not engage in a proselytizing recitation of scripture and verse, but merely invited each student to take a Bible and read it, the court finds that no message of official endorsement resulted. The defendant's policy offering school students exposure to the many facets of their local community (including the religious) does not constitute the school's imprimatur as to each such facet.

Were the plaintiffs to have their way, the Rensselaer school system would exclude only religious groups from access to its classrooms. All other groups seeking permission to distribute their literature would be welcomed. In such a case, could an observer conclude other than that the purpose of the exclusion was to *disapprove* of religion? Such a purpose would be manifestly hostile to religion generally and thus run afoul of the first *Lemon* prong. The school system's policy permitting the dissemination of literature of many local groups, whether of a religious affiliation or not, thus cannot reasonably be said to be an endorsement of any particular secular or religious viewpoint.

Finally, the third *Lemon* prong addresses whether the governmental action fosters an excessive entanglement with religion. The prohibition against excessive church-state entanglement reflects the principle that secular and religious realms must not unduly overlap, else government would be destroyed and religion degraded. *Engel v. Vitale*, 370 U.S. 421, 431, 82 S.Ct. 1261, 1267, 8 L.Ed.2d 601 (1962). The Bergers argue that in three respects the distribution of Bibles constituted an impermissible entanglement of the school in Gideon's affairs: first, the distribution of Bibles had become an annual school event; second, the principal of the Rensselaer Middle School (where the fifth graders are housed) once had been a special guest at a Gideon banquet as a "thank-you" for allowing its representatives to visit the school; and, third, objecting parents whose children had received Bibles were instructed to return them to their children's teachers. The court finds that the described school involvement with the Gideon's distribution of Bibles is merely incidental and does not rise to the level of an "excessive entanglement" with religion.

Unlike in *Lemon*, the school's inconsequential involvement here does not amount to a "comprehensive, discriminating, and

continuing state surveillance" of the challenged religious activity. *Lemon,* 403 U.S. at 619, 91 S.Ct. at 2114. The Rensselaer school system does not engage in the day-to-day administration of religion as was condemned in *Lemon* and its progeny. The Gideons' visits have occurred but once a school year, and then only for a few minutes at a time. During these periods the teachers remain silent and out of the way, staying in the classroom merely in a custodial capacity to ensure good student behavior. The Gideons provide the entire funding for the Bibles they hand out, and they alone are responsible for the presentation. Under these circumstances the court cannot conclude that the school's involvement is so great as to amount to an excessive entanglement with religion in violation of the first amendment's establishment clause.

### V.

Although the distribution of religious literature in the public schools necessarily presents close and difficult questions of constitutional law, the court finds that the regime in Rensselaer under which these materials are made available to students does not run afoul of the first amendment's establishment clause.

For all of the foregoing reasons, the court concludes that plaintiffs' action for declaratory and injunctive relief is not well-founded and accordingly their request for relief is DENIED. The defendant's motion for summary judgment is GRANTED. SO ORDERED.