**Joshua H. BERGER and Moriah H. Berger, b/n/f Allen H. Berger, Plaintiff–Appellants,**

v.

**RENSSELAER CENTRAL SCHOOL CORPORATION, Defendant–Appellee.**

No. 91–2279.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 21, 1992.

Decided Jan. 5, 1993.

Order Amending Opinion and Denying Rehearing Feb. 17, 1993.

---

Robert K. Skolrood, Nat. Legal Foundation, Virginia Beach, VA, John R. Price (argued) Indianapolis, IN, Jay A. Sekulow (argued) American Center for Law and Justice, Virginia Beach, VA, for defendant-appellee.

Joel H. Greenburg, Chicago, IL, Samuel Rabinove, American Jewish Committee, New York City, for amici curiae American Jewish Committee, Nat. Council of Churches of Christ in U.S., Unitarian Universalist Ass'n, American Jewish Congress and Americans United for Separation of Church and State.

Richard E. Shevitz, Hopper, Wenzel & Galliher, Sheila Suess Kennedy, Rubin & Levin, Indianapolis, IN, Steven M. Freeman, Anti–Defamation League of B'Nai B'Rith, New York City, for amicus curiae Anti–Defamation League of B'Nai B'Rith.

Richard E. Shevitz, Hopper, Wenzel & Galliher, Sheila Suess Kennedy, Rubin & Levin, Indianapolis, IN, for amicus curiae Indiana Interreligious Com'n on Human Equality.

Richard J. Darko, Lowe, Gray, Steele & Hoffman, Indianapolis, IN, for amicus curiae Indiana State Teachers Ass'n.

Peggy M. Hodges, American Family Ass'n, Tupelo, MS, for amicus curiae American Family Ass'n, Inc.

Robert K. Skolrood, Brian M. McCormick, Nat. Legal Foundation, Virginia Beach, VA, for amicus curiae Nat. Legal Foundation.

Keith A. Fournier, American Center for Law and Justice, Virginia Beach, VA, for amicus curiae American Center for Law and Justice.

Before CUMMINGS, Circuit Judge, PELL, Senior Circuit Judge, and KAUFMAN, Senior District Judge.[*]

Franklin A. Morse, II (argued), Barnes & Thornburg, South Bend, IN, Richard A. Waples, Indianapolis, IN, for plaintiffs-appellants.

CUMMINGS, Circuit Judge.

 People are accustomed to finding Gideon Bibles tucked in the drawers of

* The Honorable Frank A. Kaufman, Senior District Judge in the District of Maryland, is sitting by designation.

**1162**

their hotel rooms; much less frequently do they find them stashed in the desks of their public school classrooms. In Rensselaer, Indiana, however, representatives of Gideon International have distributed Bibles in the public schools—usually in classrooms—for so many years that no one can seem to remember when the practice began. Moriah H. Berger and her brother Joshua are students in schools operated by the Rensselaer Central School Corporation ("Corporation"). Moriah was seven years old and in the first grade at Monnett Elementary School in May 1990 when plaintiffs filed an amended complaint challenging the Corporation's association with the Gideons. Joshua was ten years old and enrolled in the fifth grade at Rensselaer Central Middle School. The father of these children, Allen H. Berger, brought this suit on their behalf seeking to have the Corporation's practice declared an unconstitutional violation of the First Amendment's directive that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The district court threw out the Bergers' suit on summary judgment.

Though briefs in this case were first filed eighteen months ago, oral argument was postponed because the Supreme Court had on its docket the case of *Lee v. Weisman*, —— U.S. ——, 112 S.Ct. 2649, 120 L.Ed.2d 467. It is clear from the tenor of the initial briefs of both parties as well as from the numerous *amici* submissions in our case that, among those who follow such trends, the Supreme Court had been expected to work a radical change in Establishment Clause jurisprudence to allow more state involvement with religion. Defendants

quoted as an expert source none other than *The Washington Post* for the proposition that *Lee* might "lead to an historic ruling which would 'allow a greater role for religion in public life'" (defendant's brief at 25). Defendant's brief discussed the expected shift anxiously, almost gleefully, because the prevailing precedent, *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745, was highly unfavorable to its position. However, the Supreme Court in *Lee* did not accept the invitation issued by the Solicitor General and others to give the government greater freedom to inject religion into its activities and policies. *Lee*, —— U.S. at ——, 112 S.Ct. at 2655. Instead, the Court left *Lemon* untouched, and created an equally vigilant Establishment Clause precedent by outlawing the practice of Providence, R.I. public schools of inviting clergy to deliver nonsectarian prayers at graduation ceremonies.

As a result, we must continue to view with suspicion governmental forays into religious activity, particularly in the context of public schools. The relationship between the Corporation and the Gideons cannot survive this scrutiny. Under the principles enunciated in *Lemon* and *Lee*, the distribution of Bibles in Indiana schools offends the First Amendment of the Constitution, and we are compelled to reverse the district court, 766 F.Supp. 696.

### I.

The Rensselaer Central School Corporation has a written policy allowing the superintendent of schools and the principal of a given institution to grant permission to members of the community who wish to distribute literature or other publications to students.[1] This policy appears to give a

---

1. The policy reads as follows:

5501.1 In the best interest of the student body, no person, group, or other organization shall distribute, display, or exhibit any book, tract, map, picture, sign, or other publication of any type on the Rensselaer Central School Corporation premises unless authorized by the superintendent and the building principal.

5501.2 Approval for the distribution, display or exhibit of any materials by any persons, group, or organizations not sponsored by the school must be cleared 72 hours (three (3)

school days) in advance of any distribution, display, or exhibit through the superintendent and the building principal[']s offices. If permitted, the time and location of distribution, display, or exhibit is to be determined by the administration. * * *

5505.5 Any person, group, or organization not a part of the Rensselaer Central School Corporation[ ] that does not abide by the above policy, at the request of school officials, shall be considered guilty of trespass and reported to local civil authorities.

principal, in conjunction with the superintendent, total discretion to grant or deny access to school property. Yet the policy offers the principal and superintendent no guidance on how to exercise this discretion other than the general reminder to act in students' best interests. It does not tell school officials whether they may favor certain speakers because some messages are more appropriate for children than others. Nor does the policy tell the superintendent or principal whether presentations and distributions by non-school personnel may be made during times ordinarily reserved for instruction. The policy does not say, for example, whether school officials could allow a local clothes merchant into the classroom one afternoon to peddle this or that brand of jeans in place of the usual algebra lesson—or whether the principal's cousin could come in and hand out leaflets pitching his candidacy for mayor.[2]

By all accounts, such difficult cases did not arise in Rensselaer except for the distribution of Gideon Bibles, and there were no disputes under the policy until Mr. Berger protested to the Corporation that he did not think it appropriate for his children and other students to receive religious material in the public schools.[3] In 1985, when Joshua was in the first grade, he and the other youngsters were given a publication called *My Favorite Book* that was published by the "Jesus' Love Foundation" in conjunction with several local shopkeepers. In the elder Berger's opinion, the book was nondenominational but religious in its treatment of citizenship and lifestyle. Though he expressed disbelief to his wife that such materials would be distributed in public schools, Mr. Berger did not protest to the Corporation. In 1989, however, Mr. Berger learned of the Rensselaer school policy permitting the Gideons to distribute

Bibles (Berger dep. at 8–16, plaintiffs' app. at 323–331). On October 27, 1989, he sent a letter to Superintendent Roberta Dinsmore requesting an end to the practice. Mr. Berger, who is a professor of anthropology, said that the relationship between public schools and the Gideons "is in clear violation of constitutional principles mandating a separation of church and state" (plaintiffs' app. at 375). The letter was discussed at a meeting of the school board on December 19, 1989. The president of that body, in raising the issue for the first time, also pronounced its resolution by declaring that the board had decided not to alter its policy regarding the Gideons. According to the minutes of the meeting, the president said:

> "Around November 1, the Board of Education received a letter questioning the legality of allowing the Gideons to pass out Bibles to the 5th grade students. Since that time a great deal of research has gone into the subject. The Board has had contact with a number of organizations across the United States and has, through this contact, come to a conclusion. I will briefly mention some of the information which we received. First, there have been very few actual cases involving the Gideons['] distribution of Bibles in the Public Schools. * * * At this time it is illegal to pass out Bibles in New Jersey and the eastern part of Arkansas. The Supreme Court has heard none of these cases. An important fact is that none of these cases have any jurisdiction in our own State which is in the 7th Judicial Circuit. Therefore, our policy concerning distribution, display or exhibition of materials on schools premises remains unchanged."

(plaintiffs' app. at 531). The audience was then invited to speak; all but one person

---

5505.6 Questions concerning the distribution of materials on school premises that are not answered by the above policy shall be presented to the Board of School Trustees for clarification.

**2.** It is a measure of the policy's flexibility that what could be considered a simple trespass statute has been used to allow a religious group to distribute Bibles during class time.

**3.** The policy itself does not treat religion directly and, thus, on its face, raises no Establishment Clause concerns. The Bergers raised an as-applied challenge to the Corporation's practice of allowing Gideon representatives to distribute Bibles to fifth graders. This opinion uses "policy" and "practice" interchangeably to refer to the Corporation's actions toward the Gideons.

**1164**

voicing an opinion supported the existing policy. *Id.* Nothing said by the citizen commentators prompted the school board to change its mind, and the president's remarks reprinted above represent the school board's only public discussion of this issue.

■ Though Mr. Berger's letter did not sway the school board, it did scare off the Gideons. According to a representative of the organization, its policy is to sidestep litigation by avoiding schools where it meets strong opposition (Kooy dep. at 8, plaintiffs' app. at 728). Thus the Gideons withdrew their offer to supply Bibles during the 1989–1990 school year, at least temporarily ending a practice that extended back thirty-five years or more. As a result, neither Joshua nor Moriah Berger actually received a Bible from the Gideons.[4]

When the Gideons did distribute Bibles, they sent two representatives who came once a year after clearing a date with the principal. There was no set method of distribution. However, the men usually went to each of five classrooms of fifth graders, always during regular school hours. They spoke for a minute or two about their organization—their exact statements are not in the record—and offered up a painful pun that the books, the covers of which were red, were meant to be read. We take this to mean that the Gideons made at least some statements to students encouraging them to read the Bible. After the presentation, the students were instructed to take a Bible from a stack of Bibles placed on a table or desk. During certain years the Bibles were distributed not in classrooms but in the auditorium or gymnasium, or perhaps the hallway. On such occasions the fifth graders were as-sembled in the auditorium or gymnasium for the short presentation by the Gideons.

The teachers, though present, did not participate in handing out the Bibles. At times the principal also attended. The students were frequently told to take the publications home to their mothers and fathers and to return the books to their teachers if their parents objected. It is unclear from the record how often this happened, if at all, or by what mechanism the teachers returned Bibles to the Gideons. For some years the school asked students to obtain the signed permission of a parent before accepting a Bible. This practice ended several years ago. Neither the principal nor superintendent gave a reasoned explanation for abandoning permission forms. Apparently school officials did not expend much energy thinking about how the Gideons were to distribute Bibles, or the implications of that distribution. Indeed, a school board member told Mr. Berger that it had never occurred to him anyone might object, and indeed no one other than Mr. Berger ever complained about the relationship between Rensselaer schools and the Gideons (Berger dep. at 22, plaintiffs' app. at 337).

The Bibles given students in Rensselaer schools contained the entire New Testament but only the books of Proverbs and Psalms from the Old Testament. One student testified by affidavit that the Bible she received contained a blank space for a signature under the written statement, "My Decision to Receive Christ as My Savior" (plaintiffs' brief at 11). In most other Bibles, however, the front page of the Bible merely had blank lines under "Presented to," followed by the Gideons' address in Nashville. The next page contained a red,

---

4. Defendant argued in the district court that the Bergers did not have standing to challenge the school policy because neither Joshua nor Moriah had received Gideon materials. The practice had been to distribute Bibles to fifth graders. Because the Gideons canceled their offer to distribute Bibles during the 1989–1990 school year when Joshua was in the fifth grade, he did not receive religious literature, and Moriah is still several years shy of the fifth grade. The district court decided that plaintiffs did have standing—in large measure because, having affirmed its policy, the school board could renew the allegedly wrongful activity at any time. In fact, the principal of the Rensselaer Central Middle School refused to say in his deposition how he would treat further requests by the Gideons (Lewis dep. at 33–34, plaintiffs' app. at 651–652). Defendant does not challenge the district court's findings on standing in this appeal, and we need not reconsider the issue in any detail except to note that Judge Sharp decided the question correctly.

white and blue drawing of an American flag and a quote from Proverbs 14:34: "Righteousness exalteth a nation: but sin is a reproach to any people." On the title page was the statement, "The New Testament of Our Lord And Savior Jesus Christ With Psalms and Proverbs * * * Commonly Known As The Authorized (King James) Version * * *." By all accounts, the Bibles were not used for pedagogical purposes. The teachers did not discuss religion in conjunction with the distribution, and the Bibles were not studied for their historical or literary value. They were presented simply as a gift from the Gideons to be read daily for personal enrichment.

The Gideons were not the only group to take advantage of the Corporation's open-door policy. According to defendant, the Boy Scouts, Tri–Kappa Sorority, the 4–H Club and other unnamed groups have at various times addressed students in Rensselaer schools (defendant's brief at 4–5). In addition, these groups and others circulated parental permission forms for participation in their extracurricular activities, and the Jesus' Love Foundation handed out a religious publication entitled *Young People of the Bible* in addition to the nondenominational *My Favorite Book*, which Joshua Berger received in the first grade (defendant's brief at 5–6). The record contains but one example of school officials exercising their discretion to deny access to outsiders. The superintendent rejected for unspecified reasons a poster that was to be pinned on a bulletin board. The superintendent said in her deposition only that the poster was not what she had expected (Dinsmore dep. at 25–27, plaintiffs' app. at 451–453). Asked the sorts of presentations that would not be permitted in her schools, the superintendent said that she would exclude promoters of "satanism" because "we are responsible for protecting the moral being of the kids." The superintendent seemed to leave room for rejecting other groups as well. When questioned if "[i]n concrete terms, other than satanists, is there any other religious organization or anti-religious organization that you can think of at this time that you would put in the category of those whose material you would not approve?" she said merely, "I do not know all their names, no" (Dinsmore dep. at 74–75, plaintiffs' app. at 500–501).

II.

■ Attempting a definitional coup, defendant tells us at page 15 of its brief that this is not, after all, a case about the Establishment Clause but a case about free speech. The issue is said to be the right of Gideons to freely express themselves by handing out Bibles to schoolchildren. Specifically, the Corporation suggests that Rensselaer schools created a designated public forum under *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–49, 103 S.Ct. 948, 954–957, 74 L.Ed.2d 794, by issuing an open invitation to speakers in the community to address schoolchildren. Having opened otherwise non-public property to expressive activity, the government is supposedly obliged to treat all speakers equally. To exclude the Gideons, then, would be to discriminate based on the content of their message (defendant's brief at 15–21). Under this analysis, we need not even consider whether the government has established a preference for one religion over another, or for religion in general, by overseeing the distribution of Gideon Bibles in classrooms for non-pedagogical purposes.

This approach suffers from two failings: it distorts the facts and misconstrues the law. It is factually wrong on two counts. First, the free speech argument presumes that the Corporation did not participate in the Bible distribution. In essence, this is an argument that the distribution of Gideon Bibles lacked state action. Under this view, the Corporation was merely a conduit or neutral non-participant through whose doors ideas could pass without changing or being changed by the schools' participation. Several key facts belie the schools' non-involvement. The Bibles were distributed by Gideons—it is true—but in public schools, to young children, in classrooms,

during instructional time,[5] each year for several decades, in the presence of the teacher and often the principal, with instructions to return unwanted books not to the Gideons but to teachers. Defendant carefully notes that the distribution sometimes occurred in an auditorium as evidence that it was not part of a state-sponsored effort to indoctrinate students in the ways of the New Testament, presumably because distribution in auditoriums, as against distribution in classrooms, is less suggestive of state-sponsored Bible study. Yet the image of hundreds of students being marched into an auditorium for the yearly distribution of Bibles cannot but leave the imprimatur of state involvement. A ten- or eleven-year-old fifth grader cannot be expected to make subtle distinctions between speakers or instructors invited by the Corporation and those whose invitations are self-initiated, even assuming the children were told how the Gideons arrived in their classrooms—and there is no evidence that they were so informed. *Lee v. Weisman,* —— U.S. ——, ——, 112 S.Ct. 2649, 2657 ("These concerns have particular application in the case of school officials, whose effort to monitor prayer will be perceived by the students as inducing a participation they might otherwise reject"). It would be naive in the extreme to draw any conclusion in these circumstances other than that the Corporation was intimately involved if not downright interested in seeing that each student left at the end of the day with a Gideon Bible in his or her pocket.

The free speech argument also errs factually by depicting the Rensselaer schools as truly open fora for community speech. After combing the history of Rensselaer schools for examples of such speech, defendants could find just a few isolated, irregular talks by groups such as the Boy Scouts, the 4–H Club and a sorority. Moreover, the record is barren of addresses or literary distributions by political groups or religious organizations other than the Gideons. The only exceptions were books entitled *My Favorite Book* and *Young People of the Bible* printed by the Jesus' Love Foundation and a few local merchants. In any event, it is clear that Rensselaer schools—despite the open policy—were not overrun with members of other religions vying for the students' faith. It is dubious whether public schools could or should be used for such purposes, but the salient point here is that Rensselaer school classrooms were not, in fact, open and active fora for competing ideas, contrary to assertions by the Corporation.

One other factual point is worth noting. Defendant contends that as a neutral arbiter of a neutral policy, it could not exclude the Gideons without engaging in content discrimination. Yet by the superintendent's own admission, she did exercise discretion to exclude at least one publication and had every intention of excluding other groups she found objectionable, including "satanists" and other unnamed organizations offensive to the "moral being" of children. School officials cannot retain discretion over content on the one hand and on the other pretend to be manacled by the dictates of content neutrality.

Defendant offers *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440, for the proposition that, having unlocked its classrooms for public use, it is required to keep the invitation open to all, including the Gideons. In *Widmar,* the Supreme Court held that a university could not exclude a religious organization from after-school use of its facilities after allowing non-religious groups similar access. Yet *Widmar* differs from this case in one critical respect: the religious group in *Widmar* sought access to classrooms after school, the Gideons seek access to classrooms during school. In other words, the organization in *Widmar* sought access to public school *facilities.* The Gideons, by contrast,

---

**5.** The superintendent contended that the Bibles did not take up instructional time because there are a few extra minutes built into the school day (Dinsmore dep. at 71–72, plaintiffs' app. at 497–498). While it is unquestionably true that there must be unbudgeted minutes in a school day, and that the short presentation by the Gideons did not necessarily replace other instruction, the important point is that the distribution occurred during regular school hours ordinarily reserved for teaching. We do not take the superintendent to mean that students and teachers would have sat in silence for that period had the Gideons not come to distribute Bibles.

are not particularly interested in public school classrooms for their physical properties; indeed, it is doubtful that they would seek access to classrooms were they not populated by young children. There was no captive audience in *Widmar*—the classrooms were empty.[6] In Rensselaer schools, however, children have no choice but to sit through the Gideons' presentation and distribution of Bibles. Even if we were to accept defendant's patently unrealistic assertion that the fifth grade students at Rensselaer Central Middle School did not feel coerced to accept and read the Gideon version of the Bible, they were still urged by Gideon representatives to study the Christian Bible. Defendant does not discuss this issue in its brief, and at no point in the record does any school official suggest that students were free to leave the room during the Gideons' talk or to skip the school assemblies at which Bibles were distributed.

The only reason the Gideons find schools a more amenable point of solicitation than, say, a church or local mall, is ease of distribution, since all children are compelled by law to attend school and the vast majority attend public schools.[7] That the Gideons seek access to children and not facilities, as in *Widmar*, is self-evident. It is all the more odd, then, to analyze this case in terms of public forum jurisprudence. A designated public forum is a place. Children, of course, are not. Nor does it follow that, having opened a child's mind to one "use," the child's mind must be open to all uses. Even the slightest consideration should yield the conclusion that public school officials entrusted with the education of youngsters can never give up total control over the content of what transpires in classrooms, not least because the children are a captive audience. If they don't like what they see or hear, they are

most assuredly not free to get up and leave. This is not a situation like that in *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284, where courthouse visitors could simply avert their eyes from an offensive message displayed on the back of a jacket. We do not expect young children to put cotton in their ears and scrunch up their eyes to avoid overtly religious messages by the state. See *Lee*, —— U.S. at —— – ——, 112 S.Ct. at 2659–2660 (student may not be forced as conscientious objector to skip graduation ceremony). Imagine that the Gideons came to Rensselaer schools not once a year but every morning to lead students in prayer. Is there any doubt that such morning prayers would be impermissible under *School Dist. of Abington Tp., Pa. v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844, and *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601, no matter that the prayers were led by non-school employees? Recall that, in *Abington*, the Court rejected the daily recitation of the Lord's Prayer even though students could be excused from the classroom.

The analogous decision is not *Widmar* but *Illinois ex rel. McCollum v. Board of Education*, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649, in which non-school employees made use of the public schools to further religious doctrine. There the public schools in Champaign, Illinois allowed Jewish, Catholic and Protestant instructors to teach religious classes for a few hours each week during normal school time. Students could choose to sit in on religious classes or to remain in non-religious classes but, having chosen religious instruction, attendance was mandatory. The Court struck down the practice, saying:

> "Here not only are the State's tax-supported public school buildings used for the dissemination of religious doctrines. The State also affords sectarian groups an invaluable aid in that it helps to provide pupils for their religious classes

---

6. The same analysis applies to *Board of Educ. of Westside Community Schools v. By and Through Mergens*, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191, in which the Supreme Court held that public schools, having opened up classrooms for after-school use by student organizations, could not deny access to a student-led religious group.

7. It may be that the Gideons also prefer schools because it gives the Bible distribution an official quality. Some students may be confused and think that Bible reading is a homework assignment (though, given what we know about children of middle school age, it is uncertain whether this would make students more or less likely to read the Scripture).

through use of the State's compulsory public school machinery. This is not separation of Church and State."

*Id.* at 212, 68 S.Ct. at 465; see also *School Dist. of City of Grand Rapids v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (striking down program in which publicly paid teachers taught secular subjects at private religious schools). As in *McCollum,* the Gideons used Rensselaer's tax-supported public schools, relying on the state's compulsory public school machinery, to disseminate religious material to fifth graders.

Defendant is also wrong as a matter of law that the First Amendment interest in free expression automatically trumps the First Amendment prohibition on state-sponsored religious activity. The reverse is true in the coercive context of public schools. Even in *Widmar,* where the Supreme Court found that the public university had violated the speech rights of religious organizations by denying them access to after-school classrooms, the Court scrutinized the policy under *Lemon* to make certain it did not violate the Establishment Clause. *Widmar,* 454 U.S. at 270–275, 102 S.Ct. at 274–277. The Court found that opening the university's facilities to religious organizations would have a secular purpose, would not entangle the state with religion, and would not have the primary effect of advancing religion. *Id.* Had these conditions been violated, the Court would have been compelled under *Lemon* to uphold the exclusion of religious groups from university facilities. Similarly, the students, teachers and administrators in *Abington* who wished to recite daily prayers in the classroom had a cogent interest in free expression, but the prohibition against establishing a state religion prevailed. *Abington,* 374 U.S. 203, 83 S.Ct. 1560. First Amendment jurisprudence is densely populated with cases that subordinate free speech rights to Establishment Clause concerns. See, *e.g., McCollum,* 333 U.S. 203, 68 S.Ct. 461 (religious instructors may not teach on public school property); *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261 (students and teachers may not recite a state-composed non-denominational prayer); *Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (striking down a minute of silence for meditation or voluntary prayer); *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (state may not require posting of Ten Commandments in classroom). In each of these cases, people were kept from exercising very real First Amendment rights to, for example, pray or meditate or proselytize. The conflict between free speech and Establishment Clause interests arises because most religious activity necessarily involves expressive activity, and this expression may be stifled in the government's vigilance to remain neutral toward religion. See *Abington,* 374 U.S. at 222, 83 S.Ct. at 1571. More to the point, the First Amendment is intended to restrict religious activity not by individuals but by the government. As the Supreme Court said in *Engel:*

> "It is neither sacrilegious nor antireligious to say that each separate government in this country should stay out of the business of writing or sanctioning official prayers and leave that purely religious function to the people themselves and to those the people choose to look to for religious guidance."

370 U.S. at 435, 82 S.Ct. at 1269. It is only where individuals seek to observe their religion in ways that unduly involve the government that their expressive rights may be circumscribed. In sum, defendant's attempt to wrench this case out of Establishment Clause jurisprudence must fail. A public school cannot sanitize an endorsement of religion forbidden under the Establishment Clause by also sponsoring non-religious speech.

### III.

The First Amendment's mandate that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof" applies to the states through the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213. Because the Rensselaer Central School Corporation acted with state authority in welcoming the Gideons into public schools, its actions are subject to the dictates of the First Amendment. Under the Establish-

ment Clause, the government may not aid one religion, aid all religions or favor one religion over another. *Everson v. Board of Education of Ewing Tp.*, 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711. As the Supreme Court said in *Zorach v. Clauson:* "There cannot be the slightest doubt that the First Amendment reflects the philosophy that Church and State should be separated. And so far as interference with the 'free exercise' of religion and an 'establishment' of religion are concerned, the separation must be complete and unequivocal. The First Amendment, within the scope of its coverage permits no exception; the prohibition is absolute. The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State. Rather, it studiously defines the manner, the specific ways, in which there shall be no concert or union or dependency one on the other. That is the common sense of the matter."

343 U.S. 306, 312, 72 S.Ct. 679, 683, 96 L.Ed. 954. For the last twenty years the Supreme Court has accomplished the often excruciating task of keeping government and religion apart by a three-pronged test set out in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745. The so-called *Lemon* test has evolved through a series of cases such that a court must inquire (1) whether the government has the purpose of endorsing religion, (2) whether the effect of the government's action is to endorse religion, and (3) whether the policy or practice fosters an excessive entanglement between government and religion. *County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 592, 109 S.Ct. 3086, 3100, 106 L.Ed.2d 472.

As the briefs in the instant case note, *Lemon* has spawned a great deal of jurisprudential controversy, both on and off the Supreme Court. Last term's case, *Lee v.*

*Weisman*, —— U.S. ——, ——, 112 S.Ct. 2649, 2655, explicitly rejected invitations by many parties, including the United States, to scrap *Lemon*. Although the Court resolved the issues in *Lee* without reference to the three-pronged structure of *Lemon*, which would have ordinarily governed the case, *Lemon* remains the law of the land. See *Sherman v. Community Consolidated School Dist. 21 of Wheeling Tp.*, 980 F.2d 437, 445 (7th Cir.1992) (speculating on the stability of *Lemon* after *Lee*).[8] The Court said that it need not reconsider *Lemon* because of controlling precedents concerning prayer and religious exercise in primary and secondary schools.[9] *Id.* —— U.S. at ——, 112 S.Ct. at 2655. These same precedents, and in particular *Lee* itself, compel us to reverse the district court's decision sanctioning the Rensselaer Central School Corporation's policy toward the Gideons.

In *Lee*, the Supreme Court held that public school principals may not invite clergy to offer invocation and benediction prayers at formal graduation ceremonies for high schools and middle schools without offending the First Amendment. The Corporation's practice of assisting Gideons in distributing Bibles for non-pedagogical purposes is a far more glaring offense to First Amendment principles than a nonsectarian graduation prayer.

The plaintiff in *Lee* was fourteen years old; most of the recipients of Gideon Bibles in Rensselaer were ten- or eleven-year-old fifth graders. Many cases have focused on the impressionability of students in elementary and secondary schools and the pressure they feel from teachers, administrators and peers. See, *e.g.*, *Edwards v. Aguillard*, 482 U.S. 578, 584, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510; *Lee*, —— U.S. at ——, 112 S.Ct. at 2658. Expecting a student troubled by religious exercise to ob-

---

**8.** Our recent decision in *Sherman* is otherwise inapplicable. In that case we upheld an Illinois statute allowing, but not mandating, that students recite the Pledge of Allegiance. Our narrow decision in *Sherman* found that in the peculiar circumstances of the Pledge, the words "Under God" did not convert its civic character to a religious one, and so did not trigger Establishment Clause analysis. Because the distribu-

tion of Gideon Bibles is unquestionably religious, *Sherman* is irrelevant to this inquiry.

**9.** The Court has decided Establishment Clause cases before *Lee* without relying on *Lemon*. See, *e.g.*, *Lynch v. Donnelly*, 465 U.S. 668, 679, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604.

ject in this setting is unrealistic. *Abington*, 374 U.S. at 288–293, 83 S.Ct. at 1606–1609 (Brennan, J., concurring). Indeed, the Supreme Court in *Lee* distinguished *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019, which upheld the practice of beginning legislative sessions with a prayer, because a legislature cannot be compared to a school. *Lee*, —— U.S. at ——, 112 S.Ct. at 2660. If the Supreme Court was concerned about the coercive pressures on fourteen-year-old Deborah Weisman, then we must be even more worried about the pressures on ten- and eleven-year-old fifth graders in Rensselaer such as Joshua Berger.

The invocation and benediction in *Lee* was nonsectarian; the Gideon Bible is unabashedly Christian. In permitting distribution of "The New Testament of Our Lord and Savior Jesus Christ" along with limited excerpts from the Old Testament, the schools affront not only non-religious people but all those whose faiths, or lack of faith, does not encompass the New Testament. If the government may not promote a nonsectarian prayer in the Judeo–Christian tradition, then surely it may not promote the religious views of one sect. *Everson*, 330 U.S. at 15–16, 67 S.Ct. at 511.

Attendance at the graduation ceremony in *Lee* was voluntary; attendance at Rensselaer schools during the Gideon distribution was mandatory. The defendant in *Lee* argued that students could not feel coerced because they needn't attend commencement exercises at all. Justice Kennedy's opinion found this argument wanting. "Everyone knows that in our society and in our culture high school graduation is one of life's most significant occasions. A school rule which excuses attendance is beside the point * * * for absence would require forfeiture of those intangible benefits which have motivated the student through youth and all her high school years." —— U.S. at ——, 112 S.Ct. at 2659. Unlike the students in *Lee* who had at least a Hobson's choice, the fifth graders in Rensselaer schools had no choice at all. The record does not indicate whether students were told when the Gideons would address them. Even if they were, the Con-

stitution cannot tolerate a policy that forces conscientious objectors to skip their lessons, break mandatory attendance rules, and evade truant officers. As noted, Rensselaer schools made no provision to excuse from class students who did not wish to hear the Gideons urge them to study the New Testament. And as the Court said in *Lee*, standing silent during an invocation, "though subtle and indirect, can be as real as any overt compulsion * * * [because] for many, if not most, of the students at the graduation, the act of standing or remaining silent was an expression of participation in the Rabbi's prayer. * * * What matters is that, given our social conventions, a reasonable dissenter in this milieu could believe that the group exercise signified her own participation or approval of it." *Id.* —— U.S. at ——, 112 S.Ct. at 2658. Rensselaer students had similarly unavailing methods by which to dissent. They could have chosen not to accept a Bible or to return it later, but this form of dissent is insufficient, as the fifth graders were compelled to sit through the Gideons' presentation. Moreover, the act of accepting a Bible in front of other students, with the option of returning it later privately or choosing not to read it, signals accord with the Gideons' beliefs. Presumably, the fifth graders could make a public show of not accepting the Bible, just as students could walk out of the graduation ceremony in *Lee*, or leave during the scriptural reading in *Abington*, but the First Amendment prohibits the government from putting children in this difficult position.

The prayer in *Lee* occurred during an after-school extracurricular event; the Gideons distributed Bibles during instructional time. This distinction is critical because it is likely that youngsters in Rensselaer were confused about whether the Corporation endorsed the Gideons' beliefs. This is so because one does not ordinarily associate public schools with Bible distributions. Graduation exercises, by contrast, are the sort of public gatherings that traditionally commence with a prayer or invocation. The students in *Lee* had undoubtedly attended other ceremonies outside of school which had been preceded by prayers, and the fact that the schools invited clergy of different faiths made it less likely that the

graduates would be uncertain whether the school district agreed with the rabbi's message. The Gideons, however, were the sole religious group ever to address Rensselaer students and their version of the Bible was the only one distributed. That the Gideons made this appearance annually in no way softens the perception that the Corporation endorsed the Gideons' views.

*Lee* leaves little room for public schools to teach or promote religion, and the distribution of Gideon Bibles cannot fit in these restrictive confines. In so holding, we have taken our lead from *Lee* and not relied on the structure of *Lemon.* However, we note that the Corporation's Gideon policy is also unacceptable under *Lemon's* three-pronged inquiry. A statute or policy that fails to meet all three *Lemon* criteria. must be struck down as a violation of the First Amendment. See, *e.g., Wallace v. Jaffree,* 472 U.S. 38, 56, 105 S.Ct. 2479, 2489, 86 L.Ed.2d 29 (striking down statute for lacking a secular purpose). For all the reasons stated elsewhere in this opinion, which need not be repeated, the Corporation's policy falls on the wrong side of two *Lemon* prongs. Though we are confident the school district's policy is not aimed at promoting the religious values of the Gideons, it does have the effect of sending a message to an objective observer that the Corporation endorses the Gideons' beliefs, and it entangles the government unnecessarily in religious affairs.

Even though the district court decision was rendered before *Lee,* the district judge erred in finding no Establishment Clause violation under *Lemon.* The district judge opined that permitting the Gideons to distribute Bibles was no more offensive than allowing the Little League into classrooms to talk up the National Pastime. Such a conclusion is tone deaf to the Constitution's mandate that the government must not establish a state religion, and is utterly insensitive to the special concern about coercive influences on impressionable public school children. Thus we would have decided this case in the same way had the Supreme Court never heard *Lee.* That the Court so forcefully rejected nondenominational com-

mencement prayers in the public school context only strengthens our judgment that the Gideons may not distribute Bibles in Rensselaer public schools during class time for non-pedagogical purposes. The district court's decision is reversed.

## ORDER

### Feb. 17, 1993

Our slip opinion of January 5, 1993, is hereby amended in the following respects:

[Corrections have been incorporated into text for publication]

On January 19, 1993, defendant-appellee filed a petition for rehearing with suggestion for rehearing *en banc,* and an answer was filed by plaintiffs-appellants on February 3, 1993. All of the judges on the original panel have voted to deny the petition and none of the active judges[1] has requested a vote on the suggestion for rehearing *en banc.* The petition is therefore DENIED.

---

1. Circuit Judge Michael S. Kanne did not participate in consideration of the suggestion for re-

hearing *en banc.*