**Richard H. SHERMAN, a minor and Robert I. Sherman, his father and next friend, Plaintiffs–Appellants,**

v.

**COMMUNITY CONSOLIDATED SCHOOL DISTRICT 21 OF WHEELING TOWNSHIP, Helen Stein, Phil Pritzker, et al., Defendants–Appellees.**

No. 93–1698.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 10, 1993.

Decided Oct. 25, 1993.

**1162**

Richard Grossman (argued), Dannen, Crane, Heyman & Simon, Chicago, IL, for plaintiffs-appellants.

Gregory E. Rogus (argued), Phillip M. Crane, Segal, McCambridge, Singer & Mahoney, Chicago, IL, for Community Consol. School Dist. 21 of Wheeling Tp., Helen Stein, Phil Pritzker, Joy Fisher, Cary Beecher, Barrett Peterson, Laurie Ratajcak, William Rice, Lloyd Descarpentrie, Edward Searing.

Bruce F. Hoffman, Pamela J. Kempin, Pollak & Hoffman, Chicago, IL, George A. Davidson, Carla A. Kerr, Elizabeth C. Benton, Hughes, Hubbard & Reed, New York City, for Boy Scouts of America, Northwest Suburban Council.

Patrick W. O'Brien, Walter M. Rogers, Mayer, Brown & Platt, Chicago, IL, for Riley School Parent Teacher Organization.

Before BAUER, EASTERBROOK and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

This is an appeal by Richard and Robert Sherman from a denial of their prayer for declaratory and injunctive relief and from a dismissal entered in favor of the defendants.[1] The Shermans allege that the Boy Scouts' use of a public school's facilities and distribution of flyers on school grounds constitute an unconstitutional establishment of religion and deny them equal protection of the laws. For the reasons that follow, we affirm the judgment of the district court.

I

BACKGROUND

Richard Sherman attends James Whitcomb Riley School ("Riley School") in Wheeling Township, Illinois. He was, at the time of the events at issue, in the fifth grade. The Boy Scouts of America ("the BSA") offers a Cub Scout program at Riley School. Richard, and his father Robert, are both atheists. They maintain that the BSA is a religiously discriminatory organization because it requires that its members believe in God. Consequently, the Shermans object to the BSA's use of school facilities to promote and maintain its activities.

Robert Sherman has attempted to prevent the BSA from using school facilities through a variety of avenues. On August 20, 1992, he appeared before the School Board ("the Board") of the Community Consolidated School District 21 of Wheeling Township ("the school district"), the district responsible for Riley School, and requested that the Board limit the BSA's access to school district facilities because of its allegedly discriminatory policy. Also during that week, Robert Sherman personally met with the school district superintendent, Lloyd Descarpentrie, and Riley principal, Edward Searing, to discuss the BSA's use of school grounds. Each official refused to change the policy.

During the week of September 7, 1992, Richard Sherman received a flyer in his homeroom that announced a Boy Scout "Round Up" to be held in the school gym on September 14, 1992. There were also posters taped to the front doors of the school announcing the same event. Richard and Robert Sherman attended the "Round Up" and signed up to be a Cub Scout and an adult volunteer, respectively. On their applications, they both noted their objections to the required duty to God. Initially, both Shermans were assigned to a pack and den. Their den meetings were to be held on school grounds. The BSA later revoked their memberships because of their refusal to abide by

---

1. The Riley School Parent Teacher Organization moved to dismiss the complaint against it; the district court granted this motion to dismiss simultaneously with denying the plaintiffs' prayer for relief against the remaining defendants.

the provision in the Scout oath which requires belief in God.

The BSA enjoys access to Riley School for meetings pursuant to a preestablished school district policy. The Board promulgated the policy in light of the recognized responsibility of the school district "to the community and community groups to provide space for meetings, programs, and recreation."[2] Only "community organizations"[3] may use the facilities. Under this policy, "community organizations" are subdivided, and these divisions are accorded different preference and pricing schedules. "School activities"[4] are given preference over other activities and are allowed to use the facilities free of charge at all times. "Youth recreational and/or school connected activities"[5] are not given preference as to use, but are allowed to use the facilities free of charge, except on weekdays after 10 p.m. or on Saturdays. The BSA falls into this second category. Other community activities are charged minimal rental costs for their use of facilities. A number of secular and religious organizations have availed themselves of the opportunity to use school facilities.

The BSA's distribution of flyers and posters also takes place pursuant to a school district policy. When an outside organization wishes to distribute flyers to students, the flyer must first be approved by the superintendent. The superintendent evaluates it according to the following criteria: 1) The document must come from a not-for-profit organization; 2) The organization must be based in the community or provide a service that is not offered in the community; 3) The activity or activities to which the document refers must be youth oriented.[6] Once the superintendent has given his approval, the organization must arrange for copies to be sent to the schools. The flyers from the various organizations are all distributed at the same time.

Posters are evaluated in the same way as flyers; however, the principal of each school has discretion concerning where the posters are placed. At Riley, there is a policy that posters from outside organizations can only be affixed at the front entrance and doors, and outside the administrative offices.[7] Many religious and nonreligious youth organizations have chosen to advertise their activities in these ways.

The Shermans allege that the school district, its board members, and employees have violated the Establishment Clause by endorsing the religious message of the BSA. Furthermore, they claim that BSA's requirement of belief in God, and the school district's support of this discriminatory policy, violate the Shermans' right to equal protection of the laws. We turn first to the Shermans' Establishment Clause claims.[8]

## II

## ANALYSIS

### A. *The Establishment Clause*

Our Establishment Clause analysis must start with *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745

---

2. Use of School Facilities Policy (attached as exhibit A to Affidavit of Lloyd Descarpentrie) at 1.

3. The policy defines "community organizations" as "nonprofit organizations composed primarily of people who reside in District #21 and who have members and activities open to the community." Use of Facilities Policy at 1.

4. "School activities" are defined as "all activities planned and/or sponsored by the Board of Education and/or staff of the school such as student functions, programs, games, concerts, etc." Use of Facilities Policy at 3.

5. "Youth recreational and/or school connected activities shall be defined as activities planned and/or sponsored by the Parent/Teacher organizations or advisory groups which have school

administration and/or Board of Education approval such as, PTA, PTO, advisory committees and School Board Caucus activities; and/or youth groups such as scouts, campfire groups, Indian guides, etc." Use of Facilities Policy at 3.

6. Affidavit of Lloyd Descarpentrie, Superintendent of Community Consolidated School District 21.

7. Affidavit of Edward Searing, Principal of Riley School.

8. The Shermans in their brief fail to address the district court's dismissal of the PTO. Because this issue was not addressed in the appeal, any argument against the PTO is waived.

(1971).[9] *See Board of Educ. v. Alexander,* 983 F.2d 745, 753 (7th Cir.1992) (evaluating alleged violation under "traditional" test of *Lemon* ); *Harris v. City of Zion,* 927 F.2d 1401, 1411 (7th Cir.1991) (relying on "now familiar three-prong test" of *Lemon* to determine constitutional violation), *cert. denied,* —— U.S. ——, 112 S.Ct. 3025, 120 L.Ed.2d 897 (1992). In *Lemon,* the Court articulated a three-part test to determine whether the state had violated the Establishment Clause: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.'" 403 U.S. at 612–13, 91 S.Ct. at 2111–12 (citations omitted). If any prong of *Lemon* is violated, the governmental action or statute must fall. *See Berger,* 982 F.2d at 1171 ("A statute or policy that fails to meet all three *Lemon* criteria must be struck down as a violation of the First Amendment."); *Harris,* 927 F.2d at 1411 ("The challenged practice or statute ... must pass each of these tests to be found constitutional.").

At the outset, we note that alleged Establishment Clause violations in grade-school settings present heightened concerns for courts. These concerns were voiced in *School District of Grand Rapids v. Ball,* 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985): "The symbolism of a union between church and state is most likely to influence children of tender years, whose experience is limited and whose beliefs consequently are the function of environment as much as of free and voluntary choice." This concern for the age of the audience is of particular importance when the setting for the alleged violation is a public school. In this setting, "[t]he State exerts great authority and coercive power through mandatory attendance requirements, and because of students' emulation of teachers as role models and the children's susceptibility to peer pressure." *Edwards v. Aguillard,* 482 U.S. 578, 584, 107 S.Ct. 2573, 2578, 96 L.Ed.2d 510 (1987); *see also Lee,* —— U.S. at ——, 112 S.Ct. at 2658 (noting heightened concerns of "subtle coercive pressure in the elementary and secondary public schools"); *Board of Educ. v. Mergens,* 496 U.S. 226, 261, 110 S.Ct. 2356, 2377, 110 L.Ed.2d 191 (1990) (Kennedy, J., concurring) (stating that endorsement inquiry "must be undertaken with sensitivity to the special circumstances that exist in a secondary school"). Consequently, the Court "has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." *Edwards,* 482 U.S. at 583–84, 107 S.Ct. at 2577–78.

■ Though not framed explicitly according to *Lemon*'s structure, the Shermans' contention is that the school officials' actions violate the second prong of *Lemon.*[10] Specif-

---

**9.** Though it has been suggested that reliance on *Lemon* for determination of Establishment Clause violations is waning, the Supreme Court has not yet overturned *Lemon,* and recently has explicitly refused to do so. *See Lee v. Weisman,* —— U.S. ——, ——, 112 S.Ct. 2649, 2655, 120 L.Ed.2d 467 (1992) ("[W]e do not accept the invitation of petitioners ... to reconsider our decision in *Lemon v. Kurtzman....*"); *see also Lamb's Chapel v. Center Moriches Union Free School Dist.,* —— U.S. ——, —— n. 7, 113 S.Ct. 2141, 2148 n. 7, 124 L.Ed.2d 352 (1993) (noting that *Lemon* has not been overruled and the case at bar did not present an opportunity to do so); *Berger v. Rensselaer Central School Corp.,* 982 F.2d 1160, 1169 (7th Cir.) ("*Lemon* remains the law of the land."), *cert. denied,* —— U.S. ——, 113 S.Ct. 2344, 124 L.Ed.2d 254 (1993). Until the Supreme Court holds otherwise, we look to *Lemon* to guide our Establishment Clause decisions.

**10.** The Shermans have not raised any Establishment Clause arguments based on the first or third prongs of *Lemon.* These arguments are therefore waived and we limit our main discussion to the "effects" prong of *Lemon.* However, we are skeptical that a successful Establishment Clause challenge could be waged based on either the purpose or entanglement prongs. With regard to the purpose of the policies involved, the Board promulgated the policies to allow the community access to school facilities. There is no reason to question this unarguably secular purpose. Any argument based on the entanglement prong of *Lemon* would be equally futile. There is no evidence here that the school district, or its employees, undertakes any type of monitoring of the BSA flyers or posters, other than for compliance with policy guidelines. Blanket regulations, which apply equally to religious and nonreligious groups alike, are simply not the type of government involvement that raises entanglement prong concerns. *See, e.g., Lemon,* 403 U.S. at 619, 91 S.Ct. at 2114 (noting that the laws at issue would require "[a] comprehensive, discriminating, and continuing state surveillance").

ically, the Shermans contend that the school district favors religion over nonreligion because it allows the BSA to use the school premises free of charge; it permits the BSA to hang recruitment posters; and it recruits school teachers to hand out membership solicitations to grade school children. We shall address each of these objections in turn.

### 1.

■ The Shermans argue that the very structure of the facilities policy affords the BSA special treatment as a "school connected activity" and thus endorses the "anti-atheist" message of the organization. We disagree. First, it is clear from the policy that the BSA is not a "school connected" activity; this label is appended to groups such as parent teacher organizations. The BSA is a "youth recreational" activity along with Indian guides and campfire groups. Second, the Board's policy does not differentiate between the BSA and nonreligious "youth groups." All youth organizations are afforded the same status and are treated even-handedly.

This even-handed treatment of religious and nonreligious youth groups makes the school district's policy indistinguishable from situations presented to the Supreme Court in both *Board of Education v. Mergens*, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191

(1990), and *Lamb's Chapel v. Center Moriches Union Free School District*, —— U.S. ——, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). In *Mergens*, Justice O'Connor, writing for a plurality, rejected the argument that the Establishment Clause mandated exclusion of a Christian group from school facilities. "To the extent that a religious club is merely one of many different student-initiated voluntary clubs, students should perceive no message of government endorsement of religion." 496 U.S. at 252, 110 S.Ct. at 2373.[11] Similarly, in *Lamb's Chapel*, the Court held that a church could not be excluded from school facilities, open to other groups, on the basis of an alleged Establishment Clause violation. —— U.S. at ——, 113 S.Ct. at 2148.[12] Indeed, if the policy were to differentiate and were to give preference to "non-religious" groups, this would raise an Establishment Clause concern. *See Mergens*, 496 U.S. at 248, 110 S.Ct. at 2371 ("[I]f a State refused to let religious groups use facilities open to others, then it would demonstrate not neutrality but hostility toward religion.").

### 2.

■ The Shermans do not limit their challenge to the facilities policy; they also contend that the school district violates the Establishment Clause by allowing the BSA to distribute its literature during school hours

11. The ages of the children involved in this case are much younger than in *Mergens;* this factor, however, is not dispositive. In *Mergens*, a Christian student group asked to be officially recognized as a school club. 496 U.S. at 252, 110 S.Ct. at 2373. The BSA does not seek official recognition or special access to facilities. The BSA is treated just like other organizations; students are just as likely to encounter these other organizations as they are the BSA. Thus, *Mergens* presented a far more difficult "endorsement" problem, and yet the *Mergens* Court found no violation.

12. The Shermans argue that *Lamb's Chapel* supports their contention that the school district is endorsing the BSA's policy. They rely on language in *Lamb's Chapel* that the proposed meeting would have been "open to the public, not just to church members." —— U.S. at ——, 113 S.Ct. at 2148. The Shermans contend that, because the BSA meetings are not open to atheists, *Lamb's Chapel* requires a judgment in their favor. We do not believe such language tips the balance in favor of the Shermans. The Court in *Lamb's Chapel* did not find the Establishment

Clause argument a "close call"; the Court deemed it "unfounded." *Id.* In coming to this conclusion, the Court listed a number of factors that it considered:

> The showing of this film would not have been during school hours, would not have been sponsored by the school, and would have been open to the public, not just to church members. The District property had repeatedly been used by a wide variety of private organizations. Under these circumstances, as in *Widmar* [*v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981)], there would have been no realistic danger that the community would think that the District was endorsing religion or any particular creed, and any benefit to religion or to the Church would have been no more than incidental.

*Id.* Given the factual similarity between the two cases, and the fact that the Court clearly did not hinge its decision on the meeting's being open to the public, we find the Shermans' contention without merit.

and to hang its posters on school grounds. The flyers are given to students by their teachers, or by teacher-recruited student helpers, during school hours. Furthermore, there is some element of coercion present; students are required to take the flyers, even if they choose not to read them. Finally, outside the classroom, but on school grounds, children encounter the organization through its posters. Based on these factors, the Shermans suggest that children will confuse the actions of the organization for the actions of the school and therefore the school can be said to endorse the religious tenets of the BSA.

These factors, however, cannot be evaluated standing alone. Several factors are present here that significantly mitigate any Establishment Clause concerns. Flyers from all organizations are distributed to the students at one time during the week. The information in the flyers is not discussed in the classroom. It is not incorporated into the curriculum, nor is it made part of the day's learning activities. The same is true with respect to the display of posters. Many organizations, meeting the policy criteria, have displayed posters at Riley School. The front doors of Riley School are not used for a promotional campaign for the Boy Scouts, but are used as a community bulletin board, on which all qualified organizations may announce their upcoming events.

The record in this case does not present the same concerns of endorsement that the Court found in *School District of Grand Rapids v. Ball*, 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985), or more recently in *Lee v. Weisman*, —— U.S. ——, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), or that this court found in *Berger v. Rensselaer Central School Corp.*, 982 F.2d 1160 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 2344, 124 L.Ed.2d 254 (1993). In the programs challenged in *Grand Rapids*,

> the religious school students spend their typical school-day moving between religious school and "public school" classes. Both types of classes take place in the same religious school building and both are largely composed of students who are adherents of the same denomination. In this

environment, the students would be unlikely to discern the crucial difference between the religious school classes and the "public school" classes, even if the latter were successfully kept free of religious indoctrination.

473 U.S. at 391, 105 S.Ct. at 3226. Similarly, in striking down a nondenominational graduation prayer, the *Lee* Court focused on the degree of the school official's involvement in the prayer itself. Not only did school officials choose the speaker, they also provided guidelines as to what kind of prayer the speaker should give. Furthermore, the prayer took place during an important, school-sponsored event. Given these facts, the Supreme Court concluded that this was an Establishment Clause violation. *Lee*, —— U.S. at ——, 112 S.Ct. at 2661. Finally, in *Berger*, this court struck down a district's practice of allowing the Gideons to make a presentation in the classroom and distribute Bibles. The Gideons were allowed to address fifth grade students and to give their message, which usually urged students to study the New Testament. At the end of the presentation, children were encouraged to come to the front of class to receive a Bible of their own. This court concluded that these activities had the effect of endorsing the Gideons' beliefs.

Here, by contrast, dissemination of the religious message of the BSA is sufficiently divorced from the workings of the school to obviate the possibility of the students' confusing the two. The school district does not provide the organizations, including the BSA, with content guidelines for its handouts, posters, or meetings; the school district does not evaluate substantively the message of the BSA. The only time the students encounter the BSA is when they are also encountering the messages of other groups as part of the dissemination of literature about a variety of events. No special attention is drawn to the organizations or activities announced in the flyers. The BSA never has the students' undivided attention to promote its religious message.

We cannot accept the Shermans' contention that the age of the children involved tips the balance in their favor. In all three cases,

*Grand Rapids, Lee,* and *Berger,* the courts noted the need for special monitoring because of the age of the children. However, that need was not dispositive in any of these cases. The courts evaluated the state involvement in light of the ages of the children and determined that, because of the nature of state involvement, an Establishment Clause violation arose. Moreover, the nature of state involvement differs significantly here from those three cases. Because there is not a direct association between the school and the BSA—only the school and multiple community organizations—and because the students encounter nothing overtly religious in the BSA's flyers or posters, the potential for confusion between the state and the BSA, even in younger children, is greatly diminished.

We conclude, therefore, that the school district has not violated the Establishment Clause.

B. *The Equal Protection Clause*

■ The Shermans also allege that the BSA and the school district have violated their right to equal protection of the laws. The Equal Protection Clause of the Fourteenth Amendment is violated only if there is "state action." At the outset, therefore, we shall evaluate whether the role of either defendant with respect to the BSA's policy can be said to constitute "state action."

1.

■ We first turn to the question of whether the discriminatory policy of the BSA can be attributed to the school district. Guiding us down this inquiry is the Supreme Court's decision in *Gilmore v. City of Montgomery,* 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974). In *Gilmore,* the Supreme Court addressed whether a segregat-

ed organization's discriminatory policy could be attributed fairly to the city through the organization's use of municipal facilities.

Traditional state monopolies, such as electricity, water, and police and fire protection—all generalized governmental services—do not by their mere provision constitute a showing of state involvement in invidious discrimination. The same is true of a broad spectrum of municipal recreational facilities: parks, playgrounds, athletic facilities, amphitheaters, museums, zoos, and the like. It follows, therefore, that the portion of the District Court's order prohibiting mere use of such facilities by *any* segregated "private group, club or organization" is invalid because it was not predicated upon a proper finding of state action.

*Id.* at 574, 94 S.Ct. at 2426 (emphasis in original) (citations omitted). Only if the government were to "ration" facilities in favor of segregated groups, or were to provide additional benefits to such groups, would a constitutional violation arise. *Id.*

Here, the facilities were available to all on a first come first serve basis. These facilities were available to all youth organizations on the same terms and conditions; the BSA merely took advantage of what was available to all organizations of its class. Furthermore, there are no allegations that the facilities could not meet the needs of all organizations. The Shermans have not alleged that non-religious or atheistic organizations have been denied access to facilities because of the BSA's use. Finally, there seems little difference between the BSA's use of facilities and the BSA's use of the distribution policy for the purposes of the Equal Protection Clause; the BSA is merely using a method of announcement open to all.[13] We conclude, therefore, that the BSA's policy and action

13. In *National Socialist White People's Party v. Ringers,* 473 F.2d 1010 (4th Cir.1973), discussed by the Shermans, the Fourth Circuit held that no discriminatory state action was involved in letting a discriminatory organization hold an open meeting in a public building. It did not reach the question of whether discriminatory state action would exist if a closed meeting of the same group took place in the same location. "Perhaps a difference may exist where as a result of the discriminatory membership policy, the public

building is open for use only on a discriminatory basis." *Ringers,* 473 F.2d at 1018. We are not bound by the pre-*Gilmore* speculation of the Fourth Circuit. Even so, there are no allegations here that Riley School has been open for use only on a discriminatory basis. There is no evidence in the record that groups seeking use have been turned away because of the BSA's use of the facilities. Consequently, we are not presented the situation described in the Fourth Circuit dicta.

cannot be attributed to the school district, and consequently, that the school district cannot be held liable for an Equal Protection violation.

2.

Having determined that the BSA's activity cannot be attributed to the school district, we turn to the remaining issue: whether the BSA itself can be considered a "state actor" for purposes of Fourteenth Amendment liability. State action lies at the heart of the Equal Protection clause. " '[The Fourteenth] Amendment erects no shield against merely private conduct, however discriminatory or wrongful.' " *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 721, 81 S.Ct. 856, 859, 6 L.Ed.2d 45 (1961) (quoting *Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948)). This general maxim, however, must be fine-tuned. "Although the conduct of private parties lies beyond the Constitution's scope in most instances, governmental authority may dominate an activity to such an extent that its participants must be deemed to act with the authority of the government and, as a result, be subject to constitutional constraints." *Edmonson v. Leesville Concrete Co.,* —— U.S. ——, ——, 111 S.Ct. 2077, 2082, 114 L.Ed.2d 660 (1991). "[W]here the impetus for the discrimination is private, the State must have 'significantly involved itself with invidious discriminations,' in order for the discriminatory action to fall within the ambit of the constitutional prohibition." *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 173, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972) (citations omitted). There are four primary situations in which courts have determined that a state has involved itself significantly in private discriminatory activity so as to constitute state action.

The first of these is when there is a symbiotic relationship between the private actor and the state. In *Burton v. Wilmington Parking Authority,* the Court attributed the discrimination of a private restaurant to the parking authority that housed the restaurant. The Court's analysis was fact-specific, but centered on the symbiotic relationship that existed between the restaurant and the authority. The authority relied on the restaurant for revenue to pay its bonds, and also

benefitted from the restaurant customers' use of the parking facility. The restaurant gained a clientele from the users of the parking garage and also benefitted from the tax exempt status of the building. No such symbiotic relationship is present here. The BSA uses the school facilities to have its meetings and uses the distribution policy to recruit members. However, there are no special benefits conferred upon the BSA different from other area organizations. Furthermore, there is no special benefit which the BSA confers on the school district such that the school district profits from the BSA's discriminatory policy. Consequently, the BSA is not a state actor under the *Burton* rationale.

Private discriminatory conduct will also constitute state action if the discrimination is aggravated in some unique way by the involvement of governmental authority. *Edmonson v. Leesville Concrete Co.,* —— U.S. ——, ——, 111 S.Ct. 2077, 2083, 114 L.Ed.2d 660 (1991); *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). In *Shelley v. Kraemer,* which concerned court enforcement of a restrictive covenant, the plaintiffs could not have prevented a willing buyer from purchasing a home from a willing seller without a court's involvement. The court was the means through which the discrimination was achieved. Dissimilarly, the BSA would exclude atheists whether or not it used school facilities or distributed flyers in the schools. Neither is the school district the means by which the discrimination is effected. Consequently, the BSA is not a state actor under the *Shelley* analysis.

A third situation in which we would find state action arises when the state has commanded or encouraged the private discriminatory action. Neither general government involvement nor detailed regulation is sufficient to find state action. Rather, the state must "affirmative[ly] support" the private conduct challenged. *Musso v. Suriano,* 586 F.2d 59, 62 (7th Cir.1978), *cert. denied,* 440 U.S. 971, 99 S.Ct. 1534, 59 L.Ed.2d 788 (1979); *see also Rendell–Baker v. Kohn,* 457 U.S. 830, 840, 102 S.Ct. 2764, 2770, 73 L.Ed.2d 418 (1982) (citing significant state encouragement as prerequisite to finding state action); *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 357, 95 S.Ct. 449, 456,

42 L.Ed.2d 477 (1974) (holding that initiative for action must come from state; however, no evidence in record that state encouraged practice at issue). The school district has two policies which allow community organizations to use its facilities to advertise and to hold their events. The BSA is one of many organizations which take advantage of this policy. As a "youth recreational activity," it is allowed to use the facilities at a lower rate than some other community activities; however, it is treated no differently than nonreligious youth organizations such as the campfire groups and the Indian guides. The BSA's treatment by the school district is not contingent on the BSA's policy of requiring that its members believe in God. It cannot be said that the school district "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must be deemed that of the State." *Blum v. Yaretsky,* 457 U.S. 991, 1005, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982).

Finally, we would find state action in private discriminatory conduct when the private actor carries on a traditional state function. *See, e.g., Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 157–64, 98 S.Ct. 1729, 1733–38, 56 L.Ed.2d 185 (discussing traditional state functions); *see also Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (holding preprimary elections to be governmental function); *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (holding state action exists when company town deprives residents of constitutional rights). No allegations have been made on these grounds; indeed, no reasonable argument can be made that the BSA serves a traditional governmental function. Therefore, the BSA's conduct is not state action and cannot be reached through the Equal Protection clause.

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.