[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-13074
Non-Argument Calendar
_____

Agency No. A201-408-406


MUHAMMED ISLAM,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(March 26, 2020)

Before WILSON, WILLIAM PRYOR and ANDERSON, Circuit Judges.

PER CURIAM:

Muhammed Islam, a native and citizen of Bangladesh, petitions for review of an order affirming the denial of his application for asylum and withholding of removal under the Immigration and Nationality Act and for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. 8 U.S.C. §§ 1158(b), 1231(b)(3). The Board of Immigration Appeals agreed with the immigration judge that Islam failed to establish that he suffered past persecution or had a well-founded fear of future persecution in Bangladesh based on his affiliation with the Liberal Democratic Party or that he was likely to be tortured if he returned to Bangladesh. We deny Islam's petition for review.

The Board affirmed the decision of the immigration judge, so we review both their decisions. *Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 947–48 (11th Cir. 2010). Our review of the decision is "limited" by "the highly deferential substantial evidence test," under which "we must affirm if the decision of the Immigration Judge is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Silva v. U.S. Att'y Gen.*, 448 F.3d 1229, 1237 (11th Cir. 2006) (internal quotation marks omitted). Under the substantial evidence test, we view the evidence in the light most favorable to the decision of the immigration judge and draw all reasonable inferences in favor of that decision. *Id.* at 1236. We can reverse "only when the record compels a reversal; the mere fact that the record

2

may support a contrary conclusion is not enough to justify a reversal of the administrative findings." *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc).

To qualify for asylum, Islam must prove that he is a "refugee," 8 U.S.C. § 1158(b)(1)(A), who is unable or unwilling to return to his country of nationality "because of persecution or a well–founded fear of persecution on account of" his "membership in a particular social group," *id.* § 1101(a)(42)(A). He must present specific and credible evidence of persecution, *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1257 (11th Cir. 2006), which is an "extreme concept" requiring evidence of more than harassment or "a few isolated incidents of verbal harassment or intimidation," *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1231 (11th Cir. 2005). We evaluate the harms suffered cumulatively in determining whether Islam was persecuted. *De Santamaria v. U.S. Att'y Gen.*, 525 F.3d 999, 1008 (11th Cir. 2008); *Mejia v. U.S. Att'y Gen.*, 498 F.3d 1253, 1258 (11th Cir. 2007).

Our precedents set a high threshold for mistreatment to constitute persecution. Evidence that an alien was imprisoned for 36 hours in a small cell with 12 people, forced to drink a "very dirty liquid" and eat something "very bad," and endured being hit with a belt and kicked, which caused lacerations and bruising that required treatment for two days in a hospital followed by two weeks of rest did not compel a finding of persecution in *Djonda v. U.S. Att'y Gen.*, 514

3

F.3d 1168, 1171, 1174 (11th Cir. 2008). Nor, we concluded, was an alien persecuted when he was imprisoned for four days, during which he was interrogated for five hours and beaten, and then was monitored after his release. *Kazemzadeh*, 577 F.3d at 1353.

Extreme oppressive acts can rise to the level of persecution. For example, in *De Santamaria*, we concluded that an alien suffered past persecution when members of the Revolutionary Armed Forces of Colombia threatened her over the telephone and in emails, assaulted her and pulled her out of her vehicle by her hair, tortured and murdered her family groundskeeper, and later kidnapped, beat, and prepared to kill her before she was rescued by government forces. 525 F.3d at 1003–05, 1008–09. Past persecution also occurred in *Mejia*, where the alien endured threats and evaded attacks by the Revolutionary Armed Forces; its members ambushed him on a roadway, threatened him at gunpoint, and used the butt of a rifle to break his nose, which had to be repaired surgically; and sent him a "condolence letter" that mentioned his "sure death." 498 F.3d at 1255. And in *Delgado v. United States Att'y Gen.*, 487 F.3d 855 (11th Cir. 2007), we concluded that a father and son were persecuted by opponents of Hugo Chavez when the two men received threatening telephone calls, they had unloaded guns pointed at them and the triggers pulled, the father twice had his car tampered with and defaced, and the son was beaten until he was nearly unconscious. *Id.* at 861.

4

Substantial evidence supports the finding that Islam did not suffer the type of "severe" and "sufficiently extreme [maltreatment] to constitute persecution." *De Santamaria*, 525 F.3d at 1009. Islam received threatening telephone calls from and had three encounters with "goons" of the Awami League, which was the ruling party in Bangladesh, for his activities with the opposition Liberal Party. In February 2017, League members interrupted a meeting of the Party and then kicked, punched, and slapped Islam, after which he sought medical treatment and received medicine for his "gas[,] . . . fear[,] and for pain" attributable to superficial injuries to his back, chest, and face. In December 2017, League members overturned a rickshaw from which Islam was promoting the Party and kicked and punched him, but he treated his injuries with medicine that he bought at a pharmacy. In March 2018, League members barged into a Party meeting and struck Islam with weapons that cut his head and knee, broke two of his teeth, and led to a nine-day stay in a hospital. While the last incident was detestable, Islam's combined experiences with the League are more akin to the intimidation and abuse in *Djonda* and *Kazemzadeh* than the recurring and brutal harms suffered by the aliens in *De Santamaria, Mejia*, and *Delgado*. The record does not compel the conclusion that Islam suffered past persecution.

Substantial evidence also supports the finding that Islam lacks a reasonable fear of future persecution in Bangladesh. A well-founded fear of future persecution

5

exists only if an alien establishes that there is a reasonable possibility he will be singled out for persecution and that his fear is "subjectively genuine and objectively reasonable." *Kazemzadeh*, 577 F.3d at 1352. Relocation to another part of Bangladesh is a viable option for Islam, which suggests that his fear is not reasonable. 8 C.F.R. § 1208.13(b)(2)(ii); *Ruiz v. U.S. Att'y Gen.*, 241 F.3d 1320, 1327 (11th Cir. 2001). Islam testified that, after the March 2018 incident, he lived in Dhaka for four months without incident, and his wife and child reside there peacefully. The record supports the finding of the Board that League members lack "a willingness and an ability to harm [Islam] throughout Bangladesh."

Islam does not qualify for withholding of removal. That form of relief requires proof that an alien's "life or freedom would be threatened in [Bangladesh] because of" his political opinion. 8 U.S.C. § 1231(b)(3)(A). Because Islam cannot satisfy the standard to obtain asylum relief, he necessarily fails to qualify under the more stringent standard imposed for withholding of removal. *See Sepulveda*, 401 F.3d at 1233.

To qualify for relief under the Convention, Islam has to "establish that it is more likely than not that he . . . would be tortured if removed to [Bangladesh]." 8 C.F.R. § 208.16(c)(2). Torture occurs when an act intended to cause "severe pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id.*

6

§ 208.18(a)(1). Torture also involves "be[ing] individually and intentionally singled out for harsh treatment," *Jean-Pierre v. U.S. Att'y. Gen.*, 500 F.3d 1315, 1324 (11th Cir. 2007), that "the government [is] aware of, yet . . . [refrains from] interven[ing]" to prevent, *Rodriguez Morales v. U.S. Att'y Gen.*, 488 F.3d 884, 891 (11th Cir. 2007).

Substantial evidence supports the finding that Islam is unlikely to be tortured if he returns to Bangladesh. Islam submitted news articles and a County Report stating that organizations affiliated with the League intimidated and abused participants in opposition groups, but Islam was never tortured and his successful relocation suggests that the League is disinterested in pursuing him. Although Islam argues that government officials are unwilling or unable to protect him, he reported only the third incident to law enforcement officers. Islam testified that the officers "kicked [him] out of the police station [and] said . . . we're not taking any complaint[s] against the government," yet he testified that law enforcement officers came to his aid during the second incident, which caused his assailants to flee. And the Country Report states that, despite "[p]olitical affiliation often appear[sing] to be a factor in claims of arrest and prosecution," "[t]he government continue[s] to take steps to improve police professionalism, discipline, training, and responsiveness . . . ." The record does not compel a conclusion that Islam would be tortured at the direction or acquiescence of the Bangladeshi government.

7

We **DENY** Islam's petition for review.